# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE DISTRICT ATTORNEY OF
MONTGOMERY COUNTY,
KEVIN R. STEELE,

               Plaintiff,

   v.

META PLATFORMS, INC., FACEBOOK
HOLDINGS, LLC, FACEBOOK
OPERATIONS, LLC, META PAYMENTS
INC., META PLATFORMS
TECHNOLOGIES, LLC, INSTAGRAM,
LLC, SICULUS, INC., SNAP INC., TIKTOK
INC., TIKTOK LTD., TIKTOK LLC,
BYTEDANCE INC., BYTEDANCE LTD.,
ALPHABET INC., XXVI HOLDINGS INC.,
GOOGLE LLC, and YOUTUBE, LLC,

               Defendants.

Case No. 23-cv-4271


**COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION .................................................................... 1

II.     JURISDICTION AND VENUE ............................................................... 6

III.    PARTIES ................................................................................................. 7

      A.      Plaintiff ....................................................................................... 7

      B.      Meta Defendants ........................................................................ 7

      C.      Snap Defendant ........................................................................ 10

      D.      TikTok Defendants ................................................................... 10

      E.      YouTube Defendants ................................................................ 11

IV.    FACTUAL BACKGROUND .................................................................. 12

      A.      Meta's Purposefully Manipulative and Addictive Social Media
             Platform Design ....................................................................... 13

             1.      Meta's Facebook Platform ............................................ 15

             2.      Meta's Instagram Platform ........................................... 22

      B.      YouTube's Purposefully Manipulative and Addictive Design ........... 28

      C.      Snapchat's Purposefully Manipulative and Addictive Design ........... 31

      D.      TikTok's Purposefully Manipulative and Addictive Design ............... 36

V.      DEFENDANTS' BUSINESS MODELS MAXIMIZE USER SCREEN TIME,
         FUELING ADDICTION ...................................................................... 40

VI.    DEFENDANTS HAVE CHOSEN DESIGNS THAT ADDICT MINORS TO
         THEIR PLATFORMS .......................................................................... 43

VII.   DEFENDANTS' PLATFORMS CAUSE HARM TO MINORS ................... 47

      A.      Defendants' Encourage and Cause Increased Usage of Their Platforms
             by Minors ................................................................................. 47

      B.      Minors' Brains Are Particularly Susceptible to Manipulation by Defendants ..... 50

      C.      Defendants Have Caused a Significant Mental Health Toll on Minors ............... 53

      D.      Defendants' Conduct Has Harmed Montgomery County ....................... 55

VIII.   THE COMMUNICATIONS DECENCY ACT ALLOWS COMPUTER SERVICE
         COMPANIES TO LIMIT HARMFUL CONTENT ................................... 60

IX.    CLAIMS FOR RELIEF ........................................................................ 61

X.      REQUEST FOR RELIEF ...................................................................... 70

XI.    JURY TRIAL DEMANDED .................................................................. 72

i

Plaintiff, the District Attorney of Montgomery County, Kevin R. Steele, in the name of the Commonwealth of Pennsylvania, brings this action against the following Defendant Social Media Companies and their affiliates and subsidiaries: Meta Platforms, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; (collectively referred to as "Facebook"); Meta Payments Inc.; Meta Platforms Technologies, LLC; Instagram, LLC ("Instagram"); Siculus, Inc. (collectively, Facebook, Instagram, and Siculus Inc. are referred to as "Meta"); Snap Inc. ("Snapchat"); TikTok Inc.; TikTok Ltd.; TikTok LLC; ByteDance Inc.; ByteDance Ltd. (collectively, the TikTok and ByteDance entities are referred to as "TikTok"); Alphabet Inc.; XXVI Holdings Inc.; Google LLC; and YouTube, LLC (collectively, the Alphabet, XXVI, Google, and YouTube entities are referred to as "YouTube") (collectively, "Defendants" or "Defendant Social Media Companies").

## I.     <u>NATURE OF THE ACTION</u>

1. Today's youth are experiencing a mental health crisis fueled by the Defendant Social Media Companies, who are ruthlessly seeking to maximize profits at any cost and with callous disregard for the harm that their platforms cause to minors' mental and behavioral health.

2. Over the last two decades, across the country, including within Montgomery County, an astounding number of adolescents have begun to suffer from poor mental health and behavioral disorders. Indeed, according to the CDC, "[b]etween 2007 and 2018, the national suicide rate among persons aged 10-24 increased 57.4%."[1]

3. In 2021, the U.S. Surgeon General issued an advisory alerting the public that "[r]ecent national surveys of young people have shown alarming increases in the prevalence of certain mental health challenges" and that "[i]n 2019 one in three high school students and half of

---

[1] Sally C. Curtin, M.A., *State Suicide Rates Among Adolescents and Young Adults Aged 10-24: Untied States, 2000-2018*, CDC (Sept 11, 2020), https://www.cdc.gov/nchs/data/nvsr/nvsr69/nvsr-69-11-508.pdf.

female students reported persistent feelings of sadness or hopelessness, an overall increase of 40% from 2009."[2]

4.      The current state of youth mental health has led the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, and the Children's Hospital Association to declare a national emergency.[3]

5.      These dramatic increases in youth mental health deterioration have directly coincided with the growth of Defendants' social media platforms, which have exploited the vulnerable brains of America's youth, hooking tens of millions of students across the country into feedback loops, which Defendants know will lead to excessive use (and abuse) of social media.

6.      According to research, 90% of children ages 13-17 use social media.[4] Even younger children also regularly use social media, with studies showing 38% of children ages 8-12 use social media,[5] 49% of children ages 10-12 use social media, and 32% of children ages 7-9 use social media.[6]

7.      As a means of increasing revenue as much as possible, Defendants deliberately design and operate their platforms to maximize users' screen time. Defendants accomplish this by building features intended to exploit human psychology, using complex algorithms driven by advanced artificial intelligence and machine-learning systems.

---

[2] *Protecting Youth Mental Health*, U.S. Surgeon General Advisory (Apr. 11, 2023), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.
[3] AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health, Am. Acad. Pediatrics (Oct. 19, 2021), https://www.aap.org/en/advocacy/child-and-adolescent-healthy-mental-development/aap-aacap-cha-declaration-of-a-national-emergency-in-child-and-adolescent-mental-health/.
[4] *Social Media and Teens*, Am. Acad. of Child & Adolescent Psychiatry (Mar. 2018), https://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Social-Media-and-Teens-100.aspx.
[5] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, 2021 at 5, Common Sense Media (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.
[6] *Sharing Too Soon? Children and Social Media Apps*, C.S. Mott Children's Hosp. Univ. Mich. Health (Oct. 18, 2021), https://mottpoll.org/sites/default/files/documents/101821_SocialMedia.pdf.

8.      As part of this quest to maximize revenue, Defendants exploit adolescent users' still-developing decision-making capacity, impulse control, emotional maturity, and poor psychological resiliency.

9.      Nobody except the Defendant Social Media Companies could have foreseen this unprecedented youth mental health crisis. Despite knowing that minors are much more likely to sustain serious psychological harm through social media use than adults, Defendants knowingly seek to grow the use of their platforms by minors through designs, algorithms, and policies that promote addiction, compulsive use, and other severe mental harm—and by thwarting the ability of parents to keep their children safe and healthy by supervising and limiting social media use.

10.     The results of Defendants' actions have a known effect on minors' mental health as "[t]here is a substantial link to depression, and that link tends to be stronger among girls" and "[t]he same is true for self-harm, . . . '[t]he more hours a day she spends using social media, the more likely she is to engage in self-harm behaviors – the link is there for boys as well.'"[7] Moreover, "[m]ost of the large studies show that heavy users of social media are about twice as likely to be depressed as light users."[8]

11.     In fact, the Surgeon General has linked social media's relentless focus on profits over safety to the youth mental health crisis, stating that social media's "[b]usiness models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways."[9] President Biden recently reiterated this conclusion, asserting in his recent 2023 State of the Union address that "social media companies" must be held "accountable for the experiment they are running on our children for

---

[7] Jennifer A. Kingson, *Social media's effects on teen mental health comes into focus*, Axios (Jan. 11, 2023), https://www.axios.com/2023/01/11/social-media-children-teenagers-mental-health-tiktok-meta-facebook-snapchat.
[8] *Id*.
[9] *Protecting Youth Mental Health*, *supra* note 2.

profit."[10] There is no question that children are facing a growing mental health crisis of epidemic proportions. And there is similarly no question that Defendants are the cause of this crisis.

12.     Plaintiff seeks to hold Defendants responsible for the harm caused by their conduct, which preys on their youngest and most vulnerable users.

13.     Local communities are on the front lines of the unfair fight between large corporate Defendants preying on America's youth and communities attempting to address the ongoing youth mental health crisis.

14.     Indeed, local communities, including Montgomery County, are forced to spend substantial—and increasing—resources as the first responders in an attempt to alleviate the rising rates of suicidal ideation, depression, anxiety, and other tragic indices of this public health crisis affecting minors in their community.

15.     Plaintiff's communities have directly borne the consequences of Defendants' detrimental action towards young people, as children and adolescents in Montgomery County are seriously impacted by this ongoing adolescent mental health crisis.

16.     In the 2022-2023 school year, there were approximately 116,115 students enrolled in schools throughout Montgomery County. Defendants' unlawful conduct has exposed those students to the potential for significant harm.

17.     Shockingly, in 2021, 38.4% of students in schools in Montgomery County in sixth, eighth, tenth, and twelfth grades reported feeling depressed or sad on ***most days*** within the past twelve months.[11] Moreover, 21% of that same population reported that "[s]ometimes I think that

---

[10] *Remarks of President Joe Biden – State of the Union Address as Prepared for Delivery*, White House (Feb. 7, 2023), https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/02/07/remarks-of-president-joe-biden-state-of-the-union-address-as-prepared-for-delivery/.

[11] *2021 Pennsylvania Youth Survey: Montgomery County*, Pa. Comm'n Crime & Delinquency, Pa. Dep't of Drug & Alcohol Progs., Pa. Dep't Educ. (2021) at 60, https://www.pccd.pa.gov/Juvenile-Justice/Documents/2021%20PAYS /County%20Reports%202021%20PAYS/County%20Reports_Montgomery%20County%20Profile%20Report.pdf.

life is not worth it," and 16.7% reported self-harm within the past twelve months.[12] Among those respondents who reported being bullied through social media in the past year: 58.7% reported feeling so sad or hopeless that they stopped doing their usual activities; 40.9% seriously considered suicide within the past year; 32.6% made a suicide plan within the past year; and 26.8% attempted suicide one or more times.[13]

18.     The severe impact of the youth mental health crisis created by Defendants on Plaintiff's communities has impacted Plaintiff's ability to provide adequate social services and mental health services to the adolescents in its community.

19.     Defendants' conduct in fueling the youth mental health crisis has also led Plaintiff to expend additional financial and human resources to address the mental health needs of minors in their communities.

20.     Additionally, the youth mental health crisis is infecting all aspects of education  and the ability of young people to participate productively as members of their local communities as young people experience record rates of anxiety, depression, and other mental health issues because of Defendants' intentional conduct. These children and adolescents perform worse in school, are less likely to attend school, and are more likely to engage in substance use and to act out negatively in their local community, all of which directly affects Plaintiff's ability to provide safe communities and the ability of schools in Plaintiff's communities to fulfill their educational mission.

21.     These increases in youth mental health problems interfere with Plaintiff's ability to foster safe communities and provide adequate mental health services to the young residents of their

---

[12] *Id.*
[13] *Id.* at 63.

communities. Plaintiff needs more funding to meet the ever-growing needs of youth facing this mental health crisis.

22.     Plaintiff requires funding to develop a long-term plan to deal with the mental health crisis and address the record rates of depression, anxiety, suicidal ideation, and the other tragic byproducts caused by Defendants. Plaintiff also needs Defendants to be held responsible for their continued use of algorithms, social media features, and policies that target minors and that Defendants know are a driving force behind the current mental health crisis for minors in Plaintiff's community, and for Defendants to cease targeting youths for profit.

23.     The District Attorney of Montgomery County brings this action to hold Defendants accountable under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") for their role in creating and perpetrating the mental health crisis. The District Attorney seeks disgorgement of the revenues acquired by Defendants through their targeting of minors in the County. The District Attorney also seeks disgorgement, restitution, civil penalties, injunctive relieve, as well as restitution to fund mental health services along with community and educational outreach programs to abate the public nuisance Defendants have caused.

24.     Despite Defendants' knowledge of the youth mental health crisis they have fueled, Defendants have not provided remediation to Plaintiff and its communities and schools.

## II.     <u>JURISDICTION AND VENUE</u>

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiff and Defendants are residents and citizens of different states.

26.     The Court has personal jurisdiction over Defendants because they do business in the Eastern District of Pennsylvania and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion,

marketing, and operation of their platforms at issue in this lawsuit in Pennsylvania, and by retaining the profits and proceeds from these activities, rendering the exercise of jurisdiction by this Court permissible under Pennsylvania law and the United States Constitution.

27.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## III.    PARTIES

### A.      Plaintiff

28.     Plaintiff is the District Attorney of Montgomery County, Pennsylvania, who brings this action pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1-201-9.3.

29.     The District Attorney is expressly authorized to bring this action under the UTPCPL whenever the District Attorney has reason to believe that any person is using or is about to use any method, act, or practice declared by the UTPCPL to be unlawful, and that such proceedings would be in the public interest. 73 P.S. § 201-4; § 201-8(b).

30.     Based on the allegations in this Complaint, the District Attorney has considerable reason to believe that Defendants have used, and will continue to use, methods, acts, and/or practices declared by the UTPCPL to be unlawful and is bringing this action for the public's benefit.

### B.      Meta Defendants

31.     Defendant Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, California.

32.     Defendant Meta develops and maintains social media platforms, communication platforms, and electronic devices that are widely available to users throughout the United States. The platforms developed and maintained by Meta include Facebook (including its self-titled app, Marketplace, and Workplace), Messenger (including Messenger Kids), Instagram, and a line of electronic virtual reality devices and services called Meta Quest (collectively, "Meta platforms").

33.     Meta transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with its subsidiaries (identified below), Meta has advertised, marketed, and distributed the Meta platforms to consumers throughout the United States. At all times material to this Complaint, Meta formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

34.     Defendant Meta's subsidiaries include: Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments, Inc.; Meta Platforms Technologies, LLC; Instagram, LLC; and Siculus, Inc.

35.     Defendant Facebook Holdings, LLC ("Facebook Holdings") was organized under the laws of the state of Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook Holdings is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Facebook Holdings.

36.     Defendant Facebook Operations, LLC ("Facebook Operations") was organized under the laws of the state of Delaware on January 8, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. The principal place of business of Facebook Operations is in Menlo Park, California. Defendant Meta is the sole member of Facebook Operations.

37.     Defendant Meta Payments, Inc. ("Meta Payments") was incorporated in Florida on December 10, 2010, as Facebook Payments Inc. In July 2022, the entity's name was amended to Meta Payments, Inc. Meta Payments is a wholly owned subsidiary of Meta Platforms, Inc. Meta Payments manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

38.     Defendant Meta Platforms Technologies, LLC ("Meta Technologies") was organized under the laws of the state of Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. In November 2018, the entity's name was amended to Facebook Technologies, LLC. In June 2022, the entity's name was amended again, this time to Meta Platforms Technologies, LLC. Meta Technologies develops Meta's virtual and augmented reality technology, such as the Meta Quest line of services, among other technologies related to Meta's platforms, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Meta Technologies.

39.     Defendant Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2012, Meta purchased the company for approximately $1 billion. Meta reformed the limited liability company under the laws of the state of Delaware on April 7, 2012, and the company's principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Instagram.

40.     Defendant Siculus, Inc. ("Siculus") was incorporated in Delaware on October 19, 2011. Siculus is a wholly owned subsidiary of Meta, which supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, California.

### C.    **Snap Defendant**

41.     Defendant Snap Inc. ("Snap") is a Delaware corporation with its principal place of business in Santa Monica, California. Snap transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Snap has advertised, marketed, and distributed the Snapchat social media platform to consumers throughout the United States. At all times material to this Complaint, Snap formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

### D.    **TikTok Defendants**

42.     Defendant TikTok Ltd. wholly owns its subsidiary Defendant TikTok LLC ("TikTok LLC") which is, and at all relevant times was, a Delaware limited liability company.

43.     TikTok LLC wholly owns its subsidiary Defendant TikTok Inc. f/k/a Musical.ly, Inc. ("TikTok Inc.).

44.     TikTok Inc. was incorporated in California on April 30, 2015, with its principal place of business in Culver City, California. TikTok Inc. transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, TikTok Inc. has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with ByteDance Inc., TikTok Inc. formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

45.     Defendant ByteDance Ltd. ("ByteDance Ltd.") is a global company incorporated in the Cayman Islands. Its principal place of business is in Beijing, China. ByteDance Ltd. also maintains offices in the United States, Singapore, India, and the United Kingdom, among other locations. ByteDance Ltd. wholly owns its subsidiary Defendant ByteDance Inc.

46.     ByteDance Inc. ("ByteDance") is a Delaware corporation with its principal place of business in Mountain View, California. ByteDance transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, ByteDance has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with TikTok Inc., ByteDance formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

### E.     **YouTube Defendants**

47.     Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California. Alphabet Inc. is the sole stockholder of XXVI Holdings Inc.

48.     Defendant XXVI Holdings Inc. is a Delaware corporation with its principal place of business in Mountain View, California. XXVI Holdings, Inc. is a wholly owned subsidiary of Alphabet Inc. and the managing member of Google LLC ("Google").

49.     Defendant Google LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in Mountain View, California. Google LLC is a wholly owned subsidiary of XXVI Holdings Inc., and the managing member of YouTube, LLC. Google LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Google LLC has advertised, marketed, and distributed its YouTube video sharing platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with YouTube, LLC, Google LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

50.     Defendant YouTube, LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in San Bruno, California. YouTube, LLC is a wholly owned subsidiary of Google LLC. YouTube, LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with Defendant Google LLC, YouTube, LLC has advertised, marketed, and distributed its YouTube social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with Google LLC, YouTube, LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

## IV.     FACTUAL BACKGROUND

51.     Social media platforms have grown exponentially over the past decade, from millions to billions of users, and are reaping billions of dollars in profit through advertising.

52.     America's youth are particularly prevalent users of social media and are, accordingly, seen as Defendants' most valuable commodities. This is borne out by minors' access to and use of social media, as 95% of teenagers aged 13-17 have cellphones[14] and 90% use social media.[15] Studies also show that even younger children have widespread social media use.[16]

53.     To obtain such a virulent spread across America's youth, each platform utilizes intentional design choices and operational methods to keep their audiences captive once on the platform. Researchers studying the effect social media has on the brain have shown that social

---

[14] Emily Vogels et al., *Teens, Social Media and Technology 2022*, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.
[15] *Social Media and Teens*, *supra* note 4.
[16] *Sharing Too Soon? Children and Social Media Apps*, supra, note 6.

media exploits "the same neural circuitry" as "gambling and recreational drugs to keep consumers using their products as much as possible."[17]

A.   **Meta's Purposefully Manipulative and Addictive Social Media Platform Design**

54.   Defendant Meta operates multiple social media platforms, including Facebook and Instagram, which substantially contribute to the ongoing youth mental health crisis.

55.   Meta's platforms are designed to create dangerous experiences for users where they are systematically exposed to tailored content that is designed to promote repetitive and addictive use of their social media platforms. This experience is designed to promote maximum user engagement with the platform regardless of the consequences this engagement has on the user's mental health and overall well-being, rendering Defendants' social media platforms inherently dangerous, particularly when used by teens and children.

56.   Both the Facebook and Instagram platforms push a "feed" to users. But, importantly, the "feed" does not consist only of material posted by accounts that the user has chosen to follow. Rather, it also includes substantial volumes of material specifically selected and promoted by Meta, as well as advertising. Meta's algorithms and designs drive the experience the user has, not the user's choices.

57.   In order to maximize user engagement, and thereby maximize its profits obtained through advertising revenue made from showing ads to users, Meta promotes harmful and/or unhealthy user experiences. Meta is aware of these inherently dangerous features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement,

---

[17]   Jena   Hilliard   et   al.,   *Social   Media   Addiction*,   Addiction   Ctr   (Apr.   3,   2023),
https://www.addictioncenter.com/drugs/social-media-addiction/#:~:text=Due%20to%20the%20effect%20that,when
%20taking%20an%20addictive%20substance.

and revenue increase.  Meta's own analysis recognizes simple solutions could be effective but Meta has chosen not to implement known tools that could alleviate the harm caused by its social media platforms.[18]

58.     Moreover, Meta fails to take basic precautions that could protect the hundreds of thousands of minors using its social media platforms. For instance, Meta allows individuals to have multiple accounts, does not verify user's age or identify, and does not confirm the authenticity of email addresses. These failures exacerbate the harm Meta's social media platforms cause by making it impossible to avoid unwanted interactions. Users can open accounts as fast as those accounts can be blocked and when coupled with the excessive and addictive usage habits Meta's social media platforms promote among teens, these features create a perfect storm for depression, anxiety, and suicide and self-harm.

59.     Additionally, Meta knows that underage users are on its platforms and has deliberately designed its platforms to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children that encourages children to use Meta's social media platforms without consent, and multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media platforms no matter the circumstances.

60.     These practices, in addition to the harmful design choices Meta has made for its platforms as detailed below, have caused serious harm to the children and teens in Plaintiff's

---

[18] *Teen Girls Body Image and Social Comparison on Instagram—An Exploratory Study in the U.S.* at 40, WSJ (Sept. 29, 2021), https://s.wsj.net/public/resources/documents/teen-girls-body-image-and-social-comparison-on-instagram.pdf.

community and attending schools in Plaintiff's communities and have caused Plaintiff to expend

substantial resources to address the growing mental health challenges faced by the minors it serves.

### 1.     Meta's Facebook Platform

61.     Facebook is an online social network that is part of the Meta Platforms.

62.     Facebook is currently the largest social network in the world with approximately 2

billion daily users of as 2022.[19]

63.     When it was founded in 2004, only students at certain colleges and universities

could use the social media platform—and verification of college enrollment was required to access

the platform.

64.     In 2005, Facebook expanded and became accessible to students at twenty-one

universities in the United Kingdom and others around the world. Meta then launched a high school

version of Facebook, which Meta CEO and majority shareholder, Mark Zuckerberg, referred to as

the next logical step. Even then, however, high school networks required an invitation to join.

65.     Facebook later expanded eligibility to employees of several companies, including

Apple Inc. and Microsoft. On December 11, 2005, Facebook added universities in Australia and

New Zealand to its network and, in September 2006, Facebook opened itself up to everyone. While

Facebook claimed that it was open only to persons aged 13 and older and with a valid email

address, on information and belief, Facebook made the decision to not actually require verification

of age and/or identity and did not verify user email addresses so that underage users could literally

enter nonsense email addresses and would be provided by Meta with access to a Facebook account.

66.     Meta's history of starting as a closed platform limited to only specific users over

the age of 18, and then over the age of 13, demonstrates that Meta knows how to implement design

---

[19] Stacy Jo Dixon, *Number of Daily Active Facebook Users Worldwide as of 4th Quarter 2022 (in Millions)*, Statista (Feb. 13, 2023), https://www.statista.com/statistics/346167/facebookglobal-dau.

features meant to restrict access to persons above a certain age. Nonetheless, Meta made a deliberate decision in 2006 to distribute its platform to everyone in the world with internet access, including minors, without considering the consequences of this affirmative choice.

67.     At the same time that Facebook was expanding its platform, it also implemented a series of changes to its design meant to increase user engagement with the platform and promote platform growth including: (1) launching the "like" button; (2) creating a direct messaging service; (3) changing its newsfeed algorithm to determine what content to show users; and (4) creating content for users to post on its platform.

68.     These design changes, while profit maximizing for Facebook, had damaging consequences for Facebook's young users.

69.     For example, Facebooks' implementation of a feed and the "like" button increase social comparison pressure and publicly visible social metrics, such as "likes," turn social interaction into a competition, in ways that are particularly harmful to adolescents. Moreover, adolescents' under-developed ability to self-regulate means they are particularly vulnerable to the dopamine spikes caused by these external stimuli that activate the brain's reward system.[20] Meta is well-aware of the harm of its "like" feature as indicated by the employees involved in creating the features' public statements later decrying it and discussing its harms after leaving the company.[21]

70.     Additionally, Facebook's messaging system is harmful to underage users as it creates damaging and dangerous interactions for minors. In the direct messaging application,

---

[20] Nino Gugushvili et al., *Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion* at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.1186/s40359-022-00990-7.

[21] *See*, *e.g.*, Paul Lewis, *'Our minds can be hijacked': the tech insiders who fear a smartphone dystopia*, The Guardian (Oct. 6, 2017), https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

which is integrated into Facebook, minors can encounter unwanted and harmful interactions such as bullying and sexual exploitation. Additionally, through the message application, children are vulnerable to unsupervised interactions with adults who may be predators or other bad actors.

71.     Facebook has also designed and implemented harmful algorithms. For instance, Facebook uses algorithmic data mining that is able to pair users with whatever experience will maximize their engagement with its platform. Facebook directs users to the experiences that will maximize their engagement even if it exposes children and teens to harmful and destructive content. For instance, the algorithmic data may tailor a Facebook feed for a young girl with body image issues to show pro- anorexia content or may tailor a feed for a child struggling with depression to show pro-suicide content. Facebook has also designed and implemented a group recommendation algorithm that directs all users, including minors, to harmful groups that they would not have been exposed to but for Facebook's programming choices.

72.     Facebook also creates content, including images and GIFs, and licenses thousands of hours of music, for users to use in videos they share on Facebook. These features are designed to encourage minor users posting on Facebook and is meant to increase user's engagement on Facebook.

73.     In addition to these harmful in app features, Facebook uses push notifications and emails which create addictive behavior. These features make individuals compelled to return to Facebook's platform. Moreover, Facebook sends these notifications regardless of the time of day which means minors receive these notifications even at night when they should be sleeping or when they are in school.

74.     Facebook's privacy settings and default profile settings are also harmful to minors. An individual's Facebook profile may be public or private. On a public profile, any Facebook user

can view the photos, videos, and other content posted by the user with a public profile, whereas, on a private profile, the user's content may only be viewed by the user's followers, which the user must approve. Critically, Facebook chose to make user profiles public by default for many years. This allowed all users to see and interact with underage users with public profiles by default. Even now, while Facebook claims that it is defaulting certain categories of users into private platforms, it does not limit who may change their setting to public. Once a user changes their settings to public, Facebook again allows all users to message and interact with any user, even if the user is a minor.

75.     Permitting underage users to have public profiles exposes these young users to a wide swath of other users on the Facebook platform. Disastrously for children and teens, many of these potential connections are harmful.

76.     Ultimately, the totality of the Facebook experience, created by the feature and design choices made by Facebook, leads to addictive, compulsive, and excessive use by minors and Facebook knows that youths are particularly vulnerable to these outcomes.

77.     Despite knowing about these outcomes, Facebook has chosen to continue to implement these addictive design features because they are good for Facebook's business advancement.

78.     Indeed, these design choices were deliberately made to maximize user engagement. As Sean Parker, Meta's first President, explained in a 2017 interview:

> The thought process that went into building these applications, Facebook being the first of them, to really understand it was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you, you know, more likes and comments. It's a social-validation feedback loop that that it's exactly the kind of thing that a hacker

like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.

79.    "God only knows what it's doing to our children's brains," Mr. Parker also remarked in the same interview.

80.    Similarly, in testimony before Congress in September 2020, Tim Kendall, Facebook's first director of monetization, reaffirmed that Meta had chosen to design its platforms in ways it knew to be dangerous in order to maximize engagement. Mr. Kendall explained:

> We sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….
>
> The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.
>
> But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms— that is their ammonia. And we now know it fosters tribalism and division.
>
> Social media preys on the most primal parts of your brain, it provokes, it shocks, and it enrages. . . .
>
> Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.[22]

81.    Mr. Parker and Mr. Kendall's confessions stand in stark contrast with Meta's public statements about the safety of its platforms made at the time it was expanding the reach of its platform and the design elements meant to prolong interaction. Throughout its changes, re-designs,

---

[22]    Testimony of Tim Kendall, House Committee on Energy & Commerce (Sept. 24, 2020), https://nsarchive.gwu.edu/sites/default/files/documents/023.pdf

and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements promising the public that safety was Meta's top priority. For example, in February of 2017, Mr. Zuckerberg posted on his personal Facebook page a statement titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its artificial intelligence to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that were untrue and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his platforms were causing American youth including those in Plaintiff's community and schools.

82.    In fact, despite these public facing reassurances of Facebook's safety, in 2017, Meta employees were internally reporting to management that Facebook was causing harmful dependencies. Worse, despite these known harmful dependencies, Meta was also already marketing to children under 13, despite clear legal mandates that it could not allow children under 13 on its platform. And Meta leadership, including Mr. Zuckerberg himself, actively rejected proposed re-designs intended to minimize the harms to child and teen users, like the youth in Plaintiff's community and schools.

83.    Faced with these undeniably harmful consequences of its design choices, internally, Meta employees have offered countless suggestions and recommendations as to design changes Meta could make to protect its users from the harms Meta causes. Yet, over and over again, Meta leadership has declined, delayed, or outright ignored the vast majority of those in favor of its own financial and growth-related interests.

84.     The reason for Meta's resistance to changing the harmful nature of Facebook's platform is simple: it directly profits from the time, attention, and data its young users provide it and from the content it encourages young users to post to Facebook.

85.     Tellingly, Meta has conducted studies relating to social comparison harms on its platforms titled: "Social Comparison: Topics, Celebrities, Like Counts, Selfies" and "Appearance-Based Social Comparison on Instagram." These studies have shown that the toxic stew of design features Meta purposely embedded in its platforms cause intense mental harms to young people. Yet Meta has continued to systemically implement and continue to use these harmful design features.

86.     While Meta knows that it is harming its young users, leadership has decided to prioritize ever increasing profits over the health and well-being of its minor users.

87.     This fact was detailed by the testimony of Facebook employee France Haugen before Congress. Ms. Haugen testified: "The company's leadership knows ways to make Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people."[23] Haugen continued, "[Facebook's] profit optimizing machine is generating self-harm and self-hate—especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research."[24] As emphasized by Haugen, "Facebook became a $1 trillion company by *paying for its profits with our safety, including the safety of our children*."[25] Haugen's explosive testimony and documentary evidence have unfortunately not changed this conduct.

---

[23] Frances Haugen, Statement before United States Senate Committee on Commerce, Science and Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security (Oct. 4, 2021), https://www.commerce.senate.gov/services/files/FC8A558E-824E-4914-BEDB-3A7B1190BD49.
[24] *Id*.
[25] *Id.*

88.     Because Meta continues to prioritize its own bottom line over mental health, thousands of American children and teens, including those in Plaintiff's community and schools, continue to use Facebook daily and suffer exposure to its harmful user experience.

### 2.     Meta's Instagram Platform

89.     Instagram is a social media platform that was launched in October 2010 to feature photos taken on mobile devices. Instagram was acquired by Facebook for $1 billion in April 2012.

90.     After Facebook acquired Instagram, it underwent tremendous growth driven by Facebook's implementation of design and developmental changes meant to increase user engagement. These changes to the design and development of Instagram were undertaken without regard to their impact on children and teen users of the social media platform.

91.     Many of the design features implemented on Instagram are the same ones made on Facebook.  These include: (1) a "like" button; (2) direct messaging; (3) an algorithm designed to determine what content to show users; and (4) creating content for users to post on its platform. As described above, these features are meant to encourage compulsive and addictive use of the social media platform leading to negative outcomes for child and teen users.

92.     The "like" button feature on Instagram, direct messaging feature, and content creation features on Instagram all work like the same features on Facebook and have the same corresponding harms for adolescent users as described above. Similarly, like Facebook, Instagram permits minors to have public accounts which, for the reasons discussed above, poses known harms to the children and teen users of Instagram.

93.     The push notification in Instagram also causes the same harms as the Facebook push notification features, while also imposing additional harms through its uniquely problematic design. In the case of Instagram, Defendant Meta collects individualized data—not just about the user, but also about the user's friends and contacts—and then crafts notifications, decides

notification frequency, and notifies users via text and email using this data. Meta's notifications to individual Instagram users are specifically designed to, and do, prompt them to open Instagram and view what Instagram selected, increasing sessions, and resulting in greater profits to Instagram irrespective of user's health or wellbeing.

94.     As recent leaks of internal documents show, Instagram's feed algorithm also poses a unique harm to Instagram's teen users, of which Instagram is well aware. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and posts specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to Meta's deliberate and repeated promotion of harmful and unhealthy online experiences, which Meta knows is causing harm to minor users.

95.     Instagram also has a search feature called "Explore," where a user is shown an endless feed selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. The feed is not based on the user's searches or requests. Instead, Meta crafts the feed via its algorithms (which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta), as well as paid advertisements created with Meta's assistance or approval, and the like. Indeed, Meta's internal analyses indicate that the "Explore" feature is amongst the most damaging features for teens:



*See Teen Girls Body Image and Social Comparison on Instagram—An Exploratory Study in the U.S.*, *supra* note 18 at 31.

96.     These leaked reports from Meta also show that it is aware that Instagram is causing serious mental health problems for its teen users and has even categorized the various harms this social media platform inflicts on its teen users.[26]

---

[26] *Teen Mental Health Deep Dive*, WSJ (Sept. 29, 2021), https://s.wsj.net/public/resources/documents/teen-mental-health-deep-dive.pdf.







*See supra*, "Teen Mental Health Deep Dive," pp. 18, 27, 32 (examples only).

97.    The Instagram platform also has features known as "Reels" and "Stories," which promote the use of short videos and temporary posts, respectively. These features were developed to appeal to teens and Meta knows that the features coalesce into a toxic environment that is addictive and harmful:



*See Teen Girls Body Image and Social Comparison on Instagram*, *supra* note 18, at 33-34.

98. Yet, despite its knowledge of these harmful consequences of Instagram's algorithms, Meta refused to implement changes that could protect the mental health of its young users, instead, once again, prioritizing profits over the well-being of its children and teen users. Indeed, during Meta's 2022 Third Quarter Earnings Conference call, Mark Zuckerberg touted that increasing time spent on the Company's platforms is one of the metrics it follows, noting that reels

are "'incremental' for users spending time on Instagram" and that "'[t]he trends look good here, and we believe that we're gaining time spent share on competitors like TikTok.'"[27]

99.     Meta consciously disregards any duty to protect minors in Plaintiff's community and schools.

### B.     YouTube's Purposefully Manipulative and Addictive Design

100.     YouTube is the second-most visited website on the internet. Astoundingly, surveys by the Pew Research Center in 2022 found that 95% of American teenagers used YouTube and that one in five American teenagers reported that they used YouTube almost constantly.[28]

101.     YouTube earns the bulk of its revenue through advertisements. In order to maximize the profits earned through these revenues, YouTube has a design that allows it to embed targeted advertising directly into the video clips that its users watch, as well as promote featured content.[29]

102.     Individuals can create channels on YouTube where they post content they create. When these channel owners cross a certain viewership threshold, they can elect to monetize the channel by delivering advertisements to viewers. The revenue earned from advertisements on these channels is shared between the channel owner and YouTube. YouTube also offers systems, policies, and features to encourage creators to post more and earn rewards that can be converted into cash.

103.     YouTube has two types of advertising that its channel owners can use. The first is contextual advertising which is informed by the particular channel or video. The second is

---

[27] Kate Duffy, *Mark Zuckerberg says Instagram Reels are booming despite celebrities such as Kim Kardashian and Kylie Jenner slamming the app for being like TikTok*, Yahoo! Finance (Oct. 27, 2022), https://finance.yahoo.com/news/mark-zuckerberg-says-instagram-reels-121319465.html.
[28] Emily Vogels et al., *supra*, note 14.
[29] Andrew Beattie, *How YouTube Makes Money Off Videos*, Investopedia (Oct. 31, 2021), https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

behavioral advertising which is informed by the behavior of the device owner as tracked across different websites, apps, and devices. YouTube defaults to behavioral advertising and, while it technically permits channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, almost no channel owners make this choice. This is likely because channel owners receive warnings that disabling behavioral advertising can significantly reduce their channel's revenue.

104.    YouTube's advertising strategy is effective, as demonstrated by the fact that it generated total advertising revenues of $28.8 billion and $29.2 billion in fiscal years 2021 and 2022 respectively.

105.    In order to maximize its advertising profits, YouTube has designed and implemented algorithms meant to create compulsive, addictive use of its platform by minors and pushes users into dangerous "rabbit hole" experiences.

106.    While YouTube has refused to publicly disclose its algorithms, its VP of Engineering has described the algorithm it uses in broad terms as follows:

> To provide such custom curation, our recommendation system doesn't operate off of a 'recipe book' of what to do. It's constantly evolving, learning every day from over 80 billion pieces of information we call signals. That's why providing more transparency isn't as simple as listing a formula for recommendations, but involves understanding all the data that feeds into our system. A number of signals build on each other to help inform our system about what you find satisfying: clicks, watchtime, survey responses, sharing, likes, and dislikes. [30]

107.    Whatever the particulars of YouTube's algorithms, it is well aware of the fact that the algorithms on its platform promote and amplify violent and harmful experiences.

---

[30] Cristos Goodrow, *On YouTube's recommendation system*, Inside YouTube (Sept. 15, 2021), https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

108.    Internally, YouTube employees have notified leadership of these issues in the YouTube algorithm and, each time such notice is provided, they are told by YouTube leadership, "Don't rock the boat."[31] According to individuals within YouTube

> The company spent years chasing one business goal above others: 'Engagement,' a measure of the views, time spent and interactions with online videos. Conversations with over twenty people who work at, or recently left, YouTube reveal a corporate leadership unable or unwilling to act on these internal alarms for fear of throttling engagement.

*Id.*

109.    Because YouTube concluded in 2012 that the more people watched the more ads it could sell, it set a company-wide goal to reach one billion hours of viewing a day, and rewrote its recommendation engine to maximize for that goal. *Id.* In order to achieve this goal, YouTube re-designed itself to maximize addiction and stayed the course on programming its algorithm to prioritize engagement over user safety, despite its knowledge that such programming was harming a significant number of its users—including children and teens.

110.    Moreover, YouTube's algorithm-based experience is fundamental to its functionality. Indeed, "YouTube has described its recommendation system as artificial intelligence that is constantly learning which suggestions will keep users watching. These recommendations, it says, drive 70 percent of views, but the company does not reveal details of how the system makes its choices."[32]

111.    YouTube's algorithm drives users towards the content they should watch next, thus users experience on the platform is driven by the algorithm and not user's choices. Accordingly,

---

[31] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019, 5:00 am), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[32] Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles*, N.Y. Times (June 3, 2019), https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

YouTube drives young users towards content they would not have been exposed to but for YouTube's design choices.

112.   YouTube knows that underage users are on its YouTube platform and has deliberately designed its platform in a manner intended to evade parental authority and consent.

113.   YouTube is used by many millions of minors every day, including students in Plaintiff's community and schools, who have become addicted to it and suffer other severe mental harms as a result of how YouTube has designed, setup, and operates its platform design and features.

114.   YouTube consciously disregards any duty to protect minors in Plaintiff's community and schools.

C.   **Snapchat's Purposefully Manipulative and Addictive Design**

115.   Snapchat was founded in 2011 and quickly became an incredibly popular social media app among U.S. teens with 59% of children between the ages of 13-17 reporting using it.[33]

116.   Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients—and became well known for this self-destructing message feature. Specifically, Snapchat allows users to form groups and share posts, or "Snaps," that disappear after being viewed by the recipients. However, Snapchat quickly evolved from there, as its leadership made design changes and rapidly developed new features that were intended to, and that did increase, Snapchat's popularity among teen users.

---

[33] Emily Vogels et al., *supra* note 14.

117.    Among the features added by Snapchat were video capabilities, stories, and chat features. These features evolved and also grew to include various propriety features including "Our Story," Geofilters and Community Geofilters, and Snapcash.

118.    Snapchat monetized its user base by generating money through advertisements to its users.

119.    Snapchat estimates that it has tens of millions of teen users. Against this backdrop, Snapchat has numerous algorithmic features that promote dangerous use of its platform by teenagers.

120.    One of these features is "Quick Add" which sends messages to users suggesting they should "friend" another user on Snapchat. These Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators and are designed to reinforce addiction and increase the odds of maintaining more users for longer.

121.    Snapchat also generates an "Explore" feed that pushes out a never-ending stream of video. These features are designed by Snap to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

122.    Snapchat also offers several unique messaging and data features. It is perhaps most famous for its self-destructing message design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with an efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this feature.

123.    For years Snapchat has received reports of child abuse and bullying occurring through its platform and because of its features.[34] Despite these alarming reports, Snapchat continues to use and promote these features so that it does not decrease the popularity of platform.

124.    The disappearing photo feature is also dangerous because it does not actually work as advertised.  Indeed, while teens rely on Snap's representations when taking and sending photos that they will disappear, recipients are actually able to save photos – and then often use the photos a teen took under the assumption that it would be automatically deleted to bully, exploit, and/or sexually abuse the teen who took the photo.

125.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. On information and belief, during the relevant time period, Snapchat's algorithmically ranking of Stories made sure that Stories from accounts that a user interacted with the most appeared at the top of the user's Stories.

126.    Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snapchat.

127.    Snap also has a "My Eyes Only" functionality that encourages and enables minor users to hide harmful material from parents by allowing them to hide material in a special tab that

---

[34] Zak Doffman, *Snapchat Has Become A 'Haven for Child Abuse' with its 'Self-Destructing Messages'*, Forbes (May 26, 2019, 5:13 am), https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/.

requires a passcode, and where material cannot be recovered – even by Snapchat itself – without the correct passcode. The material self-destructs if a user attempts to access the hidden folder with the wrong code. My Eyes Only allows Snapchats' young users to hide potentially harmful material from parents and/or legal owners of the devices used to access Snap.

128.    On information and belief, Snapchat's disappearing messages are harmful for this reason as well. Snapchat has possession, custody, or control of that data, and knows that it will be relevant and material in the event of litigation, but has designed its technologies – *i.e.*, its advertised "disappearing" functionality which suggests that Snap itself no longer has access to such data – in a manner that frustrates and actively prevents parents from monitoring the activity of their underage children on Snapchat. These are serious harmful features, which Snapchat should be required to remedy immediately.

129.    Like Meta and TikTok, Snapchat also sends push notifications and emails to encourage addictive behavior and to increase use of Snapchat. Snapchat's communications are triggered and based upon information Snapchat collects from and about its users, and Snapchat "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat, increasing sessions, and resulting in greater profits to Snapchat. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

130.    Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, they are designed to be addictive, and to encourage greater use of Snapchat without regard to any

other content or third-party communication. While the names of these various metrics have changed over time, and certain metrics have been phased out and others phased in, their core collective function—rewarding harmful over engagement with Snapchat—has never changed.

131.    These features serve no purpose other than creating dependencies on Snapchat by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

132.    Snapchat incorporates several other features that serve no functionality purpose, but that do make Snapchat more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.*, streaks and trophies offering unknown rewards). These features and the ones discussed above were particularly addictive to youths and were targeted to underage users.

133.    The Snap Streak feature is unique to Snapchat and is one of the most – if not *the* most – addictive feature available especially to teenagers. Snap Streaks provide a measure of a user's interaction with another user, in the form of a symbol representing the user's consistent engagement with the other user's posts after a certain amount of time. If the user fails to engage with future messages from that user fast enough, Snap removes this symbol from both users' profiles. Because of Snapchat's successful efforts to integrate itself into the lives of American children, this creates social pressure to engage with Snapchat—or risk the humiliation of losing Snap Streaks. Snapchat has known for years that Snap Streak is addictive and generates compulsive use of the app in minors, yet it continues to provide and promote that feature to teens and children.

134.    Snapchat has also developed images for users to decorate the pictures or videos they post, and Snapchat has developed Lenses, which are augmented reality-based special effects

and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snapchat also has acquired publication rights to music, audio, and video content that its minor users can incorporate in the pictures and videos they post on Snapchat.

135.    These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the minor user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content.

136.     Snap consciously disregards any duty to protect minors in Plaintiff's community and schools.

### D.    <u>TikTok's Purposefully Manipulative and Addictive Design</u>

137.    TikTok was launched in or around 2017 for iOS and Android in most markets outside of mainland China and became available worldwide after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

138.    TikTok is a video sharing social media application where users create, share, and view short video clips. TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from fifteen seconds to ten minutes.

139.    Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to shape the user experience on the "For You" page based upon the user's demographics, likes, and prior activity on the app.

140.    TikTok, just like the other Defendants, has designed its algorithms to addict users and cause them to spend as much time on the application as possible, including through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

141.    A leaked internal TikTok document titled "TikTok Algo 101"[35] was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention"— that is, whether a user comes back— and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

142.    Moreover, an article by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch. Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok."[36] Another article by the New York Times confirms, "The FYP algorithm is TikTok's secret sauce, and a big part of what makes it so accurate is ByteDance's global reach. Every swipe, tap and video viewed by TikTok users around the world—billions and billions of data points a day—is fed into giant databases,

---

[35] Ben Smith, *How TikTok Reads Your Mind*, N.Y. Times (Dec. 5, 2021), https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html.
[36]    John Herrman, *How TikTok is Rewriting the World*, N.Y. Times (Mar. 10, 2019), https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html.

which are then used to train artificial intelligence to predict which videos will keep users' attention."[37]

143.    TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

144.    TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefiting TikTok. At the same time, TikTok "challenges" involve users filming themselves engaging in behavior that is routinely dangerous or risky.

145.    TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

146.    These are just some examples of how TikTok operates to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users.

147.    Until mid-2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly.

148.    Like Meta and Snapchat, TikTok also sends push notifications and emails to encourage addictive behavior in minors and to increase minor use of TikTok. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and at disruptive times of day. These notifications are specifically designed to, and do, prompt them to

---

[37] Kevin Roose, *Is TikTok a Good Buy? It Depends on What's Included*, N.Y. Times (Aug. 5, 2020), https://www.nytimes.com/2020/08/05/technology/tiktok-deal-algorithm.html.

open TikTok, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media platform— irrespective of a user's health or wellbeing.

149.   Despite this, TikTok markets itself as a family-friendly social media application, and markets to children and teens.

150.   TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

151.   TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, without parental knowledge or consent.

152.   Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or younger—a whopping 18 million—was almost as large as the number of over-14 users, which is around 20 million. The rest of TikTok's U.S. users were classified as being "of unknown age."[38]

153.   On information and belief, a substantial percentage of TikTok's U.S. users are age 13 or younger.

154.   Like the other Defendants, TikTok has tried to boost engagement and keep young users hooked to its social media platform by any means necessary.

---

[38] Raymond Zhong, Sheera Frankel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times (Aug 14. 2020), https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.

155.    TikTok has also developed memes and other images for users to apply to images and videos they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. TikTok knows that it is harming teens yet consistently opts for prioritization of profit over health and well-being of its youth and teen users— the millions of youth and teen users who continue to use its inherently dangerous and harmful social media platform every single day.

156.    Indeed, as evidenced by ByteDance's Chinese version of TikTok (Douyin), protections are available.[39]

157.    TikTok consciously disregards any duty to protect minors in Plaintiff's community and schools.

## V.    DEFENDANTS' BUSINESS MODELS MAXIMIZE USER SCREEN TIME, FUELING ADDICTION

158.    Defendants all have the same goal: to fuel addition by maximizing user screen time, including usage by minors, in order to drive advertising revenues. Defendants receive revenue from advertisers who pay a premium to target advertisements to exploit specific user behavior and demographic groups, including youth—one of the most profitable target audiences.

159.    While Defendants advertise their platforms as "free" because they do not charge their users, they generate massive revenues by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their minor users.  In fact, Defendants' revenue is directly linked to the level of user engagement and the amount of time users spend on their platforms, which directly correlates with the number of advertisements that can be shown to each

---

[39]*China: Children given daily time limit on Douyin – its version of TikTok*, BBC (Sept. 20, 2021), https://www.bbc.com/news/technology-58625934.

minor user. For example, Defendants use changing rewards that are designed to prompt minor users to engage with their social media platforms in excessive and dangerous ways.

160.    Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed their platforms to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users until they are unlocked. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior and usage by minors.

161.    Similarly, Facebook and Instagram, like Snapchat and TikTok, are designed around a series of features that seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." This design is unreasonably dangerous to the mental well-being of minors' developing minds, and has resulted in mental health disorders in youths in local communities, like Montgomery County, and schools.

162.    Defendants have reportedly employed thousands of psychologists and engineers to help make their platforms maximally addictive. For example, Instagram's "pull-to-refresh" is based on how slot machines operate. It creates an endless feed experience, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage minor users to move on to other activities.[40]

---

[40] Daniel Kruger, Ph.D., M.S., *Social Media Copies Gambling Method 'to create psychological cravings'*, University of Michigan Institute for Healthcare Policy & Innovation (May 8, 2018), https://ihpi.umich.edu/news/social-media-copies-gambling-methods-create-psychological-cravings.

163.    Rather than warning users or parents of the addictive design of their social media platforms, Defendants actively conceal the dangerous and addictive nature of their platforms, lulling minor users and parents into a false sense of security. This includes consistently playing down their platforms' negative effects on children in public statements and advertising, making false or materially misleading statements concerning safety, and refusing to make their research public or available to academics and lawmakers who request it.

164.    Defendants have repeatedly represented to the public and the government that their platforms are safe and not addictive.

165.    For example, YouTube represents that it enforces its "Community Guidelines using a combination of human reviewers and machine learning," and that its policies "aim to make YouTube a safer community …." TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity," and Snap's Terms of Service claim, "We try hard to keep our Services a safe place for all users."

166.    Defendants know that their platforms are designed to be, and are, addictive, and that millions of minor users are addicted and/or engaging in excessive and risky use, leading to mental health issues. Defendants also know, or in the exercise of reasonable care should know, that their social media platforms are unreasonably dangerous to the mental well-being of minor users' developing minds.

167.    Yet Defendants continue to engineer their platforms to keep users, and particularly minors, engaged longer and more frequently. This "engineered addiction" includes features like bottomless scrolling, tagging, notifications, and live stories.

168.    Defendants also exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (like "likes," "followers," "views,"

"streaks," and "trophies"). As recently detailed by the FTC, these design features are manipulative, dark patterns that deceive minor users into staying on the application and steer excessive usage of social media platforms.[41]

169.     Defendants purposefully engineer addiction by minors to exploit this advertising demographic and reap significant profits in advertising revenue.

## VI.    **DEFENDANTS HAVE CHOSEN DESIGNS THAT ADDICT MINORS TO THEIR PLATFORMS**

170.     Defendants have intentionally designed their social media platforms to maximize minors' screen time, using complex algorithms and other features designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available.

171.     In particular, Defendants willfully, recklessly, and intentionally designed their social media platforms to exploit minors in order to extend and expand their users' engagement with their products. Defendants target youth to exploit the still-developing brains of children through the use of artificial intelligence, machine learning, and complicated algorithms to promote extreme utilization. Defendants calibrate and optimize these addiction methods on a continual basis with one goal: to maximize revenues.

172.     Defendants designed and have progressively modified their platforms to promote problematic and excessive use that they know is indicative of addictive and self-destructive use by minors. For example, Defendants use information "feeds" that deliver personalized content, including photos, videos, and other promoted subject matter to promote maximum engagement by their minor users on an endless cycle.

---

[41] FTC Staff Report, *Bringing Dark Patterns to Light*, FTC Bureau of Consumer Protection (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

173.    YouTube, Facebook, Instagram, and TikTok all use complex algorithms to optimize user interaction through these never-ending "feeds." The endless cycle has been described by psychologists as a "flow state" that distorts a user's ability to perceive time.[42] Former Google design ethicist Tristan Harris has described this endless cycle as being intentionally designed to eliminate any reason to pause or discontinue using the platform by replacing the traditional close-ended experience of consuming media with an infinite one.[43]

174.    Defendants know that algorithm-controlled feeds promote unlimited "scrolling"— a type of use that studies have identified as detrimental to users' mental health. Defendants promote this use because it allows them to display more advertisements and obtain more revenue from each minor user.

175.    Meta, YouTube, and TikTok's algorithm-controlled features are designed to ensure experiences most likely to increase user engagement, which often means experiences that Defendants know to be harmful to their minor users. This includes experiences that minors would otherwise never have but for Defendants' sorting, prioritizing, and/or affirmative pushing of such experiences to minors' accounts.

176.    In the words of one, high-level departing Meta employee,

---

[42] Gino Gugushvili et al., Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion at 3, BMC Psych. 10, 279 (2022), https://doi.org/10.1186/s40359-022-00990-7.
[43] Von Tristan Harris, *The Slot Machine in Your Pocket*, Spiegel International (July 27, 2016), https://www.spiegel.de/international/zeitgeist/smartphone-addiction-is-part-of-the- design-a- 1104237.html.

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (Oct. 4, 2019), at 1.[44]

177.    The addictive nature of Meta, YouTube, Snap, and TikTok's platforms and the complex and psychologically manipulative design of their algorithms are unknown to ordinary consumers, particularly minors.

178.    Instead of disclosing the addictive and harmful nature of their social media platforms, Defendants go to significant lengths to prevent transparency by making public statements about the safety of their platforms that are not true and posing as "free" platforms.

179.    Meta, YouTube, and TikTok's algorithms adapt to promote whatever user experiences will trigger minor users' engagement and maximize their screen time.  Once a minor user engages with abusive, harmful, or destructive experiences, Defendants' algorithms will direct the minor user to experiences that are progressively more abusive, harmful, and destructive to maximize the user's screen time.

180.    For example, Defendants manipulate human psychology using the same techniques deployed by casinos and slot machines, including by the use of intermittent variable rewards ("IVR"), which work by tapping into the human reward pathway that regulates dopamine

---

[44] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019.

production. Through IVR, Defendants space out dopamine-triggering stimuli vis-à-vis staggering user rewards on their platforms. IVR causes users to engage with the platform again and again, not disengaging because there is an anticipatory "hit" of dopamine right around the corner. As a result, minor users anticipate the next "hit" of dopamine, creating the same craving effect experienced by gambling addicts.

181.    Defendants such as Instagram intentionally delay the loading time of content with each scroll or refresh to mimic the same anticipatory dopamine reward that casinos use. Defendants also knowingly manipulate the reward pathways of users by giving a carefully-engineered moment to build anticipation, just like the spinning of the reels or the shuffling of the cards in a casino. Whenever user content receives a "like" or a "heart," Defendants' platforms provide a reward to minors for their use, leading to additional use and addiction.

182.    Defendants deliberately and intentionally employ these schemes to encourage use by teens and children, who are especially vulnerable due to their developing brains. Young brains are especially susceptible to Defendants' strategies and manipulation. Between the ages of 10 and 12, children undergo fundamental changes in their neurological reward pathways that promote extra dopamine and oxytocin rewards for socially advantageous behavior such as admiration, attention, and approval from others.[45] Unlike adults with a more developed prefrontal cortex to regulate emotions and who have a more developed sense of self, developing adolescents have a limited capacity to resist emotional and social pressures and regulate impulses. As a result, they seek admiration, attention, and approval from others with much more persistence than adults.

183.    Defendants have knowingly, deliberately, and intentionally designed and managed their social media platforms in a way that endangers minors. Although Defendants know that their

---

[45] Zara Abrams, *Why young brains are especially vulnerable to social media*, Am. Psych. Ass'n (Aug. 25, 2022), https://www.apa.org/news/apa/2022/social-media-children-teens.

social media platforms harm minors, they continue to develop increasingly sophisticated technologies and methods to ensure minors are engaged with their platforms more intensively and for longer periods.

184.    Defendants' efforts have been successful, as minors increasingly spend time on social media platforms. Not only are adolescents particularly vulnerable to Defendants' psychological manipulations and resulting addiction, but they are also at much greater risk of developing mental disorders as a result of their social media usage driven by Defendants.

## VII.    DEFENDANTS' PLATFORMS CAUSE HARM TO MINORS

### A.    Defendants' Encourage and Cause Increased Usage of Their Platforms by Minors

185.    The addiction created by Defendants and compulsion to use social media have negative mental health consequences on minors. Defendants have driven this compulsion and have contributed to the increased mental health disorders experienced by minors, including anxiety, depression, eating disorders, and suicide.

186.    Defendants were the cause of the current youth mental health crisis long before the pandemic. But the crisis worsened during the pandemic, as school children spent more and more time online and increased their exposure to Defendants' platforms and manipulations. During remote learning and as students returned to school, there was an increased incidence of students paying attention to Defendants' social media products while in class in lieu of being mentally present in the classroom.

187.    Prior to the pandemic, American adolescents increasingly used social media for substantial portions of their day, increasing usage by 3% per year for tweens and 11% per year for

teens.[46] Following 2019, social media usage increased at a 17% per year pace, with an average of 8 hours and 39 minutes of daily usage by teens in 2021.[47] Reviews of global studies confirm drastic increases in screen usage as social interactions shifted online.[48]

188.    A comparison of Pew Research studies from 2014-2015 to studies in 2022 confirms a stark increase in the proportion of time spent online by teens:[49]



### Nearly half of teens now say they use the internet 'almost constantly'

*% of U.S. teens who say they use the internet ...*

Note: Teens refer to those ages 13 to 17. Figures may not add up to the NET values due to rounding. Those who did not give an answer are not shown.
Source: Survey conducted April 14-May 4, 2022.
"Teens, Social Media and Technology 2022"

**PEW RESEARCH CENTER**

---

[46]    *The Common Sense Census: Media Use by Tweens and Teens*, Common Sense (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.
[47] *Id.*
[48] A review of 46 research studies globally found that on average screen time for children and adolescents increased by 52% (84 minutes per day) during the pandemic. *See* Sheri Madigan et al., *Assessment of Changes in Child and Adolescent Screen Time During the Covid-19 Pandemic*, JAMA Pediatrics (Nov. 7, 2022), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2798256.
[49] Emily Vogels et al., *supra* note 14.

189.    As part of that extreme growth in overall social media usage, social media dependence increased, with 54% of teens saying it would be hard to give up social media.[50]

190.    Confirming this explosion of social media usage by youths, a significant proportion of teens report using Defendants' social media platforms almost constantly.



**About one-in-five teens visit or use YouTube 'almost constantly'**

*% of U.S. teens who say they ...*

Ever use this app or site

Almost constantly visit or use this app or site

| YouTube | TikTok | Instagram | Snapchat | Facebook |
|---------|--------|-----------|----------|----------|
| 95 | 67 | 62 | 59 | 32 |
| 19 | 16 | 10 | 15 | 2 |

Note: Teens refer to those ages 13 to 17. Those who did not give an answer or gave other responses are not shown.
Source: Survey conducted April 14-May 4, 2022.
"Teens, Social Media and Technology 2022"

**PEW RESEARCH CENTER**

191.    The specific mix of platform use is based on current trends, with TikTok not even registering in 2018 surveys, but being the second-highest used platform in 2022.

---

[50] *Id.*



192.     Notably, increased usage has led teens to report a *decreasing* enjoyment of social

media.[52]

**B.      Minors' Brains Are Particularly Susceptible to Manipulation by Defendants**

193.     In February 2023, during the Senate Judiciary Committee's hearing on social

media's impact on child, teen, and adolescents' mental health, Senator Richard Blumenthal stated

that America is in the midst of "a public health emergency egregiously and knowingly exacerbated

---

[51] *See* Monica Anderson & Jingjing Jiang, *Teens, Social Media and Technology 2018*, Pew Research Center (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.
[52] *See* Victoria Rideout et al., *2021 The Common Sense Census: Media Use by Tween and Teens* at Table D, Common Sense (Mar. 9, 2022), https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-tweens-and-teens-2021.

by Big Tech. Aggravated by toxic content on eating disorders, bullying, even suicide. Driven by Big Tech's black box algorithms, leading children down dark rabbit holes."[53]

194.    During adolescence, the brain is still developing and is associated with psychosocial immaturity. Numerous studies have concluded that excessive use of social media can have a detrimental effect on the mental well-being of youth and teens. Social media use, especially compulsive or excessive use, can result in various psychological disorders, including behavioral, developmental, emotional, and mental disorders, such as anxiety, depression, thoughts of suicide, and eating disorders.

195.    This is exacerbated because teens' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision- making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. During childhood and adolescence, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. The brain also undergoes "pruning"—the paring off of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the

---

[53] Press Release, Blumenthal Calls on Congress to Pass Kids Online Safety Legislation During Senate Judiciary Committee Hearing, Sen. Richard Blumenthal, (Feb. 14, 2023), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-calls-on-congress-to-pass-kids-online-safety-legislation-during-senate-judiciary-committee-hearing.

"executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

196.    For minors, important aspects of brain maturation remain incomplete, including those associated with executive functions and emotion and cognition. These parts of the brain that are critical for control of impulses, emotions, and mature decision-making are still developing in teens. Defendants' social media platforms are designed to exploit minors' diminished decision-making capacity, impulse control, emotional immaturity, and lack of psychological resiliency. Studies have found that immature brains may not possess sufficient self-control to deal with the overwhelming aspects of social media and may lead minors to engage in addictive usage patterns, which Defendants encourage.[54]

197.    Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, those users experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are much more likely to become addicted to Defendants' platforms. Minors also exercise poor judgment in their social media activity and act impulsively in response to negative social media encounters.

198.    Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media platforms are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media platforms to be addictive to minors and failed to include in their platform designs any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

---

[54] Nino Gugushvili et al., *Facebook use intensity and depressive symptoms: a moderated mediation model of problematic Facebook use, age, neuroticism, and extraversion* at 3, BMC Psych. 10, 279 (Nov. 28, 2022), https://doi.org/10.1186/s40359-022-00990-7.

## C.   Defendants Have Caused a Significant Mental Health Toll on Minors

199.   A 2018 study on the effect of screen time associated with the use of electronic devices showed that staring at electronic screens is not healthy for teens.[55] First, this study concluded that: (i) "After 1 h[our]/day of use, more hours of daily screen time were associated with lower psychological well-being, including less curiosity, lower self-control, more distractibility, more difficulty making friends, less emotional stability, being more difficult to care for, and inability to finish tasks[;]" (ii) Among teens aged 14 to 17, high users of screens (7+ hours/day) were more than twice as likely [as low users of screens (1 hour/day)] to ever have been diagnosed with depression or anxiety, ever have been treated by a mental health professional, or taken medication for a psychological or behavioral issue in the last 12 months[;] and (3) "[M]ore hours of daily screen time were associated with lower psychological well-being, including less curiosity, lower self-control, more distractibility, more difficulty making friends, less emotional stability, being more difficult to care for, and inability to finish tasks."[56]

200.   A 2021 United States Surgeon General advisory report states that mental, emotional, developmental, and/or behavioral disorders are common among American children, with one in five children between the ages of 3-17 suffering from one or more of these disorders.[57] Further, "[f]rom 2009 to 2019, the share of high school students who reported persistent feelings of sadness or hopelessness increased by 40%[,]" the share "seriously considering attempting suicide" increased by 36%, and the share creating a suicide plan increased by 44%.[58]

---

[55] Jean M. Twenge & W. Keith Campbell, *Associations between screen time and lower psychological well-being among children and adolescents: Evidence from a population-based study*, 12 Preventive Med. Rep. 271-83 (Oct. 18, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6214874/.
[56] *Id.*
[57] *U.S. Surgeon General Issues Advisory on Youth Mental Health Crisis Further Exposed by COVID-19 Pandemic* U.S. Dep't of Health & Human Services (Dec. 7, 2021), https://public3.pagefreezer.com/browse/HHS.gov /30-12-2021T15:27/https://www.hhs.gov/about/news/2021/12/07/us-surgeon-general-issues-advisory-on-youth-mental-health-crisis-further-exposed-by-covid-19-pandemic.html.
[58] *Id.*

201.     Cyberbullying and abusive behavior are also prevalent on Defendants' social media platforms. A Pew Research study from 2018 determined that one in six teenagers has experienced at least one of the following forms of abusive behavior online: (1) name-calling (42%); (2) spreading false rumors (32%); (3) receiving unsolicited explicit images (25%); (4) having their activities and whereabouts tracked by someone other than a parent (21%); (5) someone making physical threats (16%); and (6) having explicit images of them shared without their consent (7%). The survey found that 90% of teens believe online harassment is a problem for people their age, and 63% identify it as a "major problem."[59]

202.     Usage of Defendants' social media platforms can also lead to disordered eating and sleep disturbances. A 2019 NIH study found a correlation between a greater number of social media accounts, as well as a greater amount of daily time spent on social media, specifically Snapchat and Instagram, and a higher incidence of eating disorders among young girls.[60] Another study of young adults found "consistent, substantial, and progressive associations between SM [social media] use and sleep disturbance," which "has important clinical implications for the health and well-being of young adults."[61]

203.     In fact, numerous studies show that adolescents are susceptible to mental health problems and psychological disorders linked to social media usage, including depression and

---

[59] Monica Anderson, *A Majority of Teens Have Experience Some Form of Cyberbullying*, Pew Research Center (Sept. 27, 2018), https://www.pewresearch.org/internet/2018/09/27/a-majority-of-teens-have-experienced-some-form-of-cyberbullying/.
[60] Simon M. Wilksch et al., *The relationship between social media use and disordered eating in young adolescents*, 53 Int'l J. Eating Disorders at 96-106 (Jan. 2020), https://pubmed.ncbi.nlm.nih.gov/31797420/.
[61] Jessica C. Levenson et al., *The Association between Social Media Use and Sleep Disturbance Among Young Adults*, 85 Preventive Med. 36-41 (Apr. 2016), https://www.sciencedirect.com/science/article/abs/pii/S0091743516000025.

suicide.[62] In addition, there is "evidence that technology-based social comparison and feedback-seeking behaviors may be associated with depressive symptoms among adolescents."[63]

204.    This youth mental health crisis has been caused by Defendants' willful, reckless, intentional, and/or negligent conduct. Defendants designed and marketed their social media platforms to addict youth so that they could profit. Defendants did this because they knew youth are a particularly profitable target audience, and thus much of Defendants' advertising efforts and revenues are focused on and derived from minors.

### D.    Defendants' Conduct Has Harmed Montgomery County

205.    Defendants' fueling of addiction and social media usage has led to a mental health crisis that has placed severe burdens and financial strains on local communities and schools, including Montgomery County and its public school system.

206.    As social media increases young people's mental health disorders, local communities like Plaintiff's, which provide youth mental health services, serve as first responders to the ongoing youth mental health crises.  Moreover, as one of the primary providers of mental health services, local communities have been inundated by the increase in youth mental health issues associated with increased social media use.

207.    Montgomery County funds and operates numerous services to address youth mental health and behavioral disorders, which are being strained and require additional financial and human resources due to the youth mental health crises caused by Defendants.

---

[62] *See, e.g.*, Jean M. Twenge et al., Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time, 6 Clinical Psych. Sci. 3-17 (Nov. 14, 2017), https://doi.org/10.1177/2167702617723376.

[63] Jacqueline Nesi & Mitchell J. Prinstein, *Using Social Media for Social Comparison and Feedback-Seeking: Gender and Popularity Moderate Associations with Depressive Symptoms*, 43 J. Abnormal Child Psych. 1427-38 (Nov. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5985443/.

208.     Specifically, Montgomery County Department of Health and Human Services' Office of Mental Health/Developmental Disabilities/Early Intervention plans, funds, and monitors mental health services provided to children and adolescents in the Montgomery County.

209.     Montgomery County also operates six local community behavioral health centers, which provide assessment, blended case management, administrative case management, treatment, and medication management, as well as other services.

210.     Community-based services offered by the county include outpatient therapy, Intensive Behavioral Health Services, the Therapeutic After School Program, Multisystemic Therapy, Partial Hospital Services, and Inpatient Services in a hospital setting. Montgomery County further provides Psychiatric Residential Treatment Facilities for children and adolescents who have exhausted community-based services.

211.     The Montgomery County Intermediate Unit is an agency that provides special services to support local school districts, and also offers multiple programs designed to meet the mental health needs of minors, including: psychological, social work, and counseling services; a bullying prevention program; a crisis response team; and a partial hospitalization program.

212.     These services are strained by the ongoing mental health crises, and local communities like Plaintiff's and its public school system are struggling to provide students with adequate mental health services and are forced to expend additional financial and human resources because of the youth mental health crisis driven by Defendants.

213.     Local communities and schools do not have sufficient funding or mental health staff to address today's youth mental health crisis.

According to data from the American Academy of Child and Adolescent Psychiatry, most counties in the United States have a severe shortage of **Child and Adolescent Psychiatrists (CAPs)** per 100,000 children.

Red=low number of Child and Adolescent Psychiatrists (CAPs)

< 5 | 5–10 | 10–15 | 15–20 | 20–25 | 25–30 | 30–35 | 35–40 | 40–45 | ≥ 45



Map: Dilcia Mercedes, CBS News • Source: American Academy of Child and Adolescent Psychiatry

214.    Given this shortage and the extent of the youth mental health crisis, the number of teens and adolescents waiting in emergency rooms for mental health treatment for suicide nationwide has tripled from 2019 to 2021.[64]

---

[64] Stephen Stock et al., *Children languish in emergency rooms awaiting mental health care*, CBS News (Feb. 27, 2023, 8:02 am), https://www.cbsnews.com/news/emergency-rooms-children-mental-health/.

215.    Local communities, and school districts within them, have borne increased costs and expenses in response to the youth mental health crisis fueled by Defendants, including costs associated with:

- hiring additional mental health staff (41% of public schools added staff to focus on student mental health);[65]

- developing additional mental health resources (46% of public schools created or expanded mental health programs for students, 27% added student classes on social, emotional, and mental health and 25% offered guest speakers for students on mental health);[66]

- training teachers to help students with their mental health (56% of public schools offered professional development to teachers on helping students with mental health);[67]

- increasing and hiring additional personnel for disciplinary services in response to increased bullying and harassment over social media;

- addressing property damage caused by students acting out because of mental, social, and emotional problems;

- diverting time and resources from educational instruction to notify parents and guardians of students' behavioral issues and attendance;

- investigating and responding to threats made against schools and students over social media; and

- updating student handbooks and policies to address use of Defendants' platforms.

216.    Montgomery County has been directly harmed by the mental health crisis caused by Defendants by, among other things, having to dedicate critical and limited financial and human resources to address this ongoing crisis.

217.    For example, Montgomery County recently allocated $5 million to establish or expand child and adolescent behavioral health services across the County's 22 school districts, in

---

[65] Nirmita Panchal et al., *The Lanscape of School-Based Mental Health Services*, Kaiser Family Foundation (Sept. 6, 2022), https://www.kff.org/other/issue-brief/the-landscape-of-school-based-mental-health-services/.
[66] *Id.*
[67] *Id.*

an effort to address "the unprecedented need across the County for increased school-based behavioral health services."[68]

218.     Similarly, the Montgomery County Intermediate Unit announced a partnership with the Children's Hospital of Philadelphia and two other counties to create a School Mental Health Consortium to plan and implement school mental health programming.[69]

219.     The Montgomery County Intermediate Unit also announced a $7.2 million initiative to "develop a sustainable infrastructure for school-based mental health programs and services."[70] The project aims to "expand suicide awareness training opportunities for students (K-12), implement a universal mental health screener to be utilized by school district or nonpublic school staff members and create an electronic data system to connect school mental health practitioners (e.g. psychologists, social workers and counselors) with community-based mental health providers that have immediate availability to support students in all levels of care (outpatient therapy to inpatient psychiatric care)."[71]

220.     This need for expanded resources to provide mental health services to young people in Plaintiff's communities and the schools therein has been directly caused by the mental health crisis among youth fueled by Defendants as local communities have been tasked with addressing the surge in mental, emotional, and social issues among this population. Plaintiff's young residents confront mental health issues now more than ever before due to their excessive social media usage.

---

[68] *Child and Adolescent Behavioral Health Program Start-Up and Technical Assistance*, Montgomery Cnty. https://www.montgomerycountypa.gov/4396/Child-and-Adolescent-Behavioral-Health-P (last visited Oct. 13, 2023).

[69] *New Partnership to Strengthen School Mental Health Services*, Children's Hosp. Phila. (May 9, 2023), https://policylab.chop.edu/node/24138.

[70] *$7.2 Million Grant to Help Provide Mental Health Services to Montgomery County Students*, Mercury (Jan. 20, 2023, 4:09 P.M.), https://www.pottsmerc.com/2023/01/20/7-2-million-grant-to-help-provide-mental-health-services-to-montgomery-county-students/.

[71] *Id.*

221.    Plaintiff has borne the cost of the increased need for youth mental health services caused by Defendants.

222.    To address the decline in minors' mental, emotional, and social health and resulting misconduct, Plaintiff has been forced to expend resources that would otherwise be used to deliver education and other community services.

223.    Plaintiff requires funding to address the mental health crisis which Defendant Social Media Companies have created and continue to exacerbate with their design of, and engineered addiction to, their social media platforms.

## VIII.  THE COMMUNICATIONS DECENCY ACT ALLOWS COMPUTER SERVICE COMPANIES TO LIMIT HARMFUL CONTENT

224.    As indicated by its title, the express purpose of the Communications Decency Act, 47 U.S.C. §230(c), is "[p]rotection [of] 'Good Samaritan' blocking and screening of offensive material."

225.    The Act states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c).

226.    The Act also asserts that providers or users may not be held liable for actions taken "to restrict access to or availability of material" or to provide others with the means to "restrict access" to material "that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. §230(c)(2)(A).

227.    These provisions of the Act are intended to protect those attempting to restrict the deluge of harmful content on internet platforms and cannot possibly serve to shield Defendants

from purposefully designing their Social Media platforms in ways that deliberately harm adolescents.

228.    Plaintiff expressly disavows any claim or allegation that attempts to hold Defendants liable as the publisher or speaker of any information provided by third parties within the plain meaning of the Communications Decency Act and as interpreted by applicable law.

229.    Plaintiff's claims stem from Defendants' conduct as the designers and marketers of social media platforms that have harmed children and created an undeniable mental health crisis among America's youth.

230.    The nature of Defendants' businesses centers around the use of design choices that encourage users to spend excessive amounts of time on their platforms without regard to the devastating consequences that this has on the mental health and well-being of America's youth. Plaintiff's claims are predicated on this conduct.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE - PUBLIC NUISANCE

231.    Plaintiff repeats, reasserts, and incorporates the allegations contained above as if fully set forth herein.

232.    A public nuisance is an unreasonable interference with a right common to the general public.

233.    In addition, a public nuisance is behavior that unreasonably interferes with the health, safety, peace, comfort, or convenience of the general community.

234.    Plaintiff and the minors in his community have a right to be free from conduct that endangers their health, comfort, and safety. Yet, Defendants have engaged in conduct that endangers or injures the health, comfort, and safety of minors in Plaintiff's community by design

and operational choices that have maximized profit over the well-being of their minor users as well as by explicitly targeting tween- and teenage children for monetary purposes.

235.    Each Defendant has created or assisted in the creation of a condition that is injurious to the health and safety of Montgomery County and minors in its community and interferes with the comfortable enjoyment of life and property of entire communities and/or neighborhoods.

236.    Defendants' conduct has caused increased mental health issues and a severe disruption of the public peace, order, and safety, including disruption of schools, classes, the learning environment, and the community at large. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

237.    The health, comfort, and safety of the minors in Plaintiff's community, including those who use, have used, or will use Defendants' social media platforms, as well as those affected by users of these social media platforms, are matters of substantial public interest and of legitimate concern to Plaintiff.

238.    Defendants' conduct has impacted and continues to impact Plaintiff and is likely to continue causing significant harm to Plaintiff and minors in Plaintiff's community and schools.

239.    But for Defendants' actions, there is no doubt that mental health issues in minors would not be as widespread as they are today, and the massive epidemic of youth and teen depression, anxiety, and self-harm that currently exists would have been averted.

240.    Logic, common sense, justice, policy, and precedent indicate Defendants' conduct has caused the damage and harm complained of herein. Defendants knew or reasonably should have known that their behavior regarding the risks and benefits of the use of Defendants' social media platforms were causing harm. Thus, the public nuisance caused by Defendants to Plaintiff was reasonably foreseeable, including the financial and economic losses incurred by Plaintiff.

241.    Defendants' actions were, at the very least, a substantial factor in the youth mental health epidemic and in the public health crisis in communities and schools, including in Montgomery County.

242.    Defendants' conduct in creating and maintaining the public nuisance were neither fully regulated nor required by any federal or Pennsylvania law.

243.    The public nuisance alleged herein can be abated and further recurrence of such harm and inconvenience can be abated.

244.    Defendants have unreasonably endangered and injured the public health and interfered with the public's right to be free from social media platforms targeting and addicting minors and to be knowledgeable concerning the dangers to minors of the use of Defendants' platforms.

245.    Plaintiff has been, and continues to be, directly and proximately injured by Defendants' actions in creating a public nuisance.

246.    Plaintiff suffered special injuries distinguishable from those suffered by the general public.

247.    Defendants have irreparably damaged the public health, and the general welfare of the residents of Montgomery County, and have thereby wrongfully caused Montgomery County to incur costs in support of public health and welfare to combat the wrongs caused by Defendants; misconduct.

248.    Defendants' conduct was accompanied by wanton, willful, and reckless disregard of persons who foreseeably might be harmed by their acts and omissions.

249.    Unless Defendants are enjoined and restrained from continuing their harmful activities and ordered to take affirmative steps to undo and abate the harm and confusion caused

by Defendants' conduct, the unreasonable endangerment of the public health as described above will continue, for which Montgomery County has no adequate remedy at law.

250.     The public nuisance created and perpetuated by the Defendants must be abated. Abatement is defined as "[t]he removal, stoppage or destruction by any reasonable means of the cause or constitution of a public nuisance." 11 Pa. C. S. A.§ 127A01.

251.     As a direct and foreseeable result of Defendants' public nuisance, the County has paid and will continue to be required to pay for ongoing youth mental health services to combat the results of Defendants' unlawful conduct, in addition to increased costs for school mental health and other services for youth affected. Accordingly, the County is entitled to compensatory damages and injunctive relief in the form of an abatement.

## COUNT TWO - NEGLIGENCE

252.     Plaintiff repeats, reasserts, and incorporates the allegations contained above as if fully set forth herein.

253.     Each Defendant failed to act as a reasonably prudent person would under circumstances where they were offering Social Media platforms to children.

254.     Each Defendant owed a duty of care to minors and to Plaintiff, including because each Defendant knew or foreseeably should have known that its conduct in designing, setting up, promoting, managing, and operating its social media platforms would inflict severe mental harms on minors, including young residents of local communities, throughout the country, which Plaintiff would have to address.

255.     Each Defendant also owed a duty to advertise their social media platforms in a truthful and non-misleading way and to monitor and report suspicious behavior or harmful activities.

256.    Defendants further had a duty to provide accurate, true, and correct information about the risks of minors using Defendants' social media platforms, and appropriate, complete, and accurate warnings about the potential adverse effects of extended social media use, in particular, social media content Defendants directed via their algorithms to minor users.

257.    Each Defendant has breached, and continues to breach, its duties of care owed to minors and to Plaintiff through its affirmative malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms.

258.    As alleged above, each Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Defendants' platforms, specifically the addictive, compulsive, and repetitive use of Defendants' platforms, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risk behavior, exposure to predators, sexual exploitation, suicidal ideation, and profound mental health issues for minors, including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

259.    Each Defendant also knew or, in the exercise of reasonable care, should have known that parents and minor users of Defendants' social media platforms were unaware of the risks and the magnitude of the risks associated with the use of the platforms, including but not limited to the risks of extended social media use and the likelihood that algorithm-based recommendations would expose adolescent users to content that is violent, sexual, or encourages self-harm, among other things.

260. Each Defendant further knew or, in the exercise of the reasonable care, should have known that their conduct violated the duty of care to minors and to Plaintiff, including providing true and correct information concerning the risks of using Defendants' platforms and appropriate, complete, and accurate warnings concerning the potential adverse effects of using the Social Media platforms.

261. Each Defendant also knew or, in the exercise of the reasonable care, should have known that their conduct could be remedied and abated.

262. Defendants, by action and inaction, representation, and omission, breached their duties of reasonable care, failed to exercise ordinary care, and failed to act as reasonably careful persons and/or companies would act under the circumstances in the design, research, development, testing, marketing, supply, promotion, advertisement, operation, and distribution of their social media platforms, in that Defendants designed, researched, developed, tested, marketed, supplied, promoted, advertised, operated, and distributed social media platforms that Defendants knew or had reason to know would negatively impact the mental health of minor users, and failed to prevent or adequately warn of these risks and injuries.

263. As a direct and proximate cause of each Defendant's unreasonable and negligent conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to damages in an amount determined at trial.

264. Defendants made conscious decisions not to warn or inform the public, including Plaintiff and minors in Plaintiff's community, even as the evidence mounted of the severe harms Defendants' platforms were inflicting on the nation's children.

**COUNT THREE – VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, 73 P.S. § 201, *ET SEQ.***

265.    Plaintiff repeats, reasserts, and incorporates the allegations contained above as if fully set forth herein.

266.    Plaintiff, on behalf of the Commonwealth of Pennsylvania, brings this claim under Pennsylvania's UTPCPL as to all defendants.

267.    The UTPCPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as defined by the statute. 73 P.S. § 201-3(a).

268.    The law further provides that "[w]henever . . . a District Attorney has reason to believe that any person is using or is about to use any method, act or practice declared by section 3 of this act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice." *Id.* § 201-4.

269.    Whenever any court issues a permanent injunction to restrain and prevent violations of the UTPCPL, the court may direct that the Defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of the UTPCPL. 73 P.S. § 201-4.1.

270.    In any action brought by a District Attorney pursuant to 73 P.S. § 201-4, if the court finds that a person, firm, or corporation is willfully using or has willfully used a method, act, or practice declared unlawful by the UTPCPL, the District Attorney, acting in the name of the Commonwealth of Pennsylvania, may recover a civil penalty of not exceeding one thousand dollars ($1,000) per violation, which civil penalty shall be in addition to other relief which may be granted under sections 4 and 4.14 of the UTPCPL. 73 P.S. § 201-8(b).

271. While conducting trade or commerce in Pennsylvania, including in Montgomery County, Defendants have engaged in unfair or deceptive business practices that directly or indirectly harmed Pennsylvania consumers within the meaning of 73 P.S. § 201-2(v) and (xxi). Specifically, Defendants have violated the UTPCPL by: (1) designing, marketing, promoting, and/or operating their platforms in a manner intended to maximize the time youth spend on their respective platforms, despite knowledge of the harms to youth from their wrongful conduct; (2) manipulating users to keep using or coming back to their platforms through the use of IVRs; (3) intentionally marketing their platforms to children and teens, directly facilitating the widespread, excessive, and habitual use of their platforms among youth; and (4) knowingly designing and modifying their platforms in ways that promote excessive and problematic use in ways known to be harmful to children.

272. The exclusions outlined in 73 P.S. § 201-3 do not apply to Defendants or their conduct. Plaintiff does not allege that Defendant Social Media Companies are liable for what third parties have said on their platforms, but rather that Defendants are liable for their own conduct. Plaintiff's claims arise from the Defendant Social Media Companies' status as designers and marketers of dangers social media platforms that have injured the health, comfort, and repose of its community. The basis of Plaintiff's claims is the nature of Defendant Social Media Companies' platforms, and Defendants' use of algorithms and other design features that encourage users to spend the maximum amount of time on their platforms—not on any particular third-party content. Moreover, Defendant Social Media Companies are liable for the content that they create. Plaintiff does not seek to hold Defendants liable as publishers or speakers of information provided by other content providers.

273. Defendants have further violated the UTPCPL by making deceptive fraud, false promises of material fact and/pr misrepresentations of material fact including, but not limited to, stating that their platforms are safe for use by minors and marketing the platforms as safe for minors.

274. Defendants have further violated the UTPCPL by concealing and/or suppressing material facts, including, but not limited to, (i) concealing and omitting that their platforms contain programs and algorithms to target and addict minor users; (ii) concealing and omitting that they design, market, promote, and/or operate their platforms in a manner intended to maximize the time youth spend on their respective platforms, and (iii) by concealing and omitting that they knowingly designing and modifying their platforms in ways that promote excessive and problematic use in ways known to be harmful to children.

275. Defendants have further violated the UTPCPL by misrepresenting their products as having characteristics, uses, and benefits they do not have and engaging in conduct that creates a likelihood of confusion or misunderstanding.

276. Defendants' conduct offends public policy, is immoral, unethical, oppressive and unscrupulous.

277. As a direct result of their foregoing acts and practices in violation of the UTPCPL, Defendants have received and will continue to receive, income, profits, and other benefits, which they would not have received if they had not engaged in violations of the UTPCPL as alleged herein.

278. As a direct result of the foregoing acts and practices in violation of the UTPCPL, the Commonwealth and its affected residents in Montgomery County and other persons in interest have suffered substantial injury as alleged herein.

279.    As Defendants' foregoing acts and practices in violation of the UTPCPL were a substantial factor in the creation of this crisis, the District Attorney seeks all legal and equitable relief as allowed by law, including, *inter alia*, injunctive relief for Defendants' violations of the UTPCPL, as authorized under 73 P.S. § 201-4. Specifically, the District Attorney seeks an injunction requiring Defendants to (i) cease their conduct that endangers or injures the health, comfort, and safety of minors in Plaintiff's community by design and operational choices that have maximized profit over the well-being of their minor users as well as by explicitly targeting tween- and teenage children for monetary purposes; and (ii) inform the public of the true risk to minors of the use of their platforms.

280.    The District Attorney further seeks and by way of restoration and/or restitution an order directing Defendants to disgorge all monies acquired or retained by Defendants as a result of their violations of the UTPCPL.

281.    The Commonwealth is entitled to the Court's assessment against Defendants of an appropriate civil penalty for each violation of the UTPCPL by them. The monies demanded herein are in excess of $50,000, exclusive of interests and costs.

282.    Unless and until enjoined and restrained by an order of this Court, Defendants will continue to cause injury to Montgomery County, and the loss of money and property in that Defendants will continue to violate the laws of Pennsylvania, unless specifically ordered to comply with the same.

## X.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, the District Attorney of Montgomery County in the name of Montgomery County and the Commonwealth, demands judgment and requests an Order as follows:

A.    Declaring that acts alleged above be adjudged and decreed to have created, or been a substantial factor in creating, a public nuisance;

70

B.      Declaring that Defendants' actions violated, and continue to violate, the UTPCPL;

C.      Declaring Defendants' conduct was and is negligent;

D.      Declaring judgment against Defendants and awarding actual, compensatory, statutory and/or punitive damages, and any additional damages, penalties, and other monetary relief provided by applicable law;

E.      Awarding a monetary award, abatement, and equitable, and/or injunctive relief in the form of a court-enforced and supervised fund and corrective action, programs, communications and other appropriate relief to restore the public health, safety, peace, and honest marketplace in Montgomery County, which will require, at least, the following:

- Funding and programs for youth metal health care services and programs associated with the early detection, ongoing testing, monitoring for detection of illness, disease process, or disease, diagnosis and treatment of resulting injuries and adverse health consequences of Defendants' conduct;

- Funding and programs to combat the abuse and excessive use of Defendants' platforms by minors, and public information campaigns to warn users of mental health effects and the addictive nature of the platforms;

- Funding, programs, studies, and research of the short and long-term effects of social media use in minors and the possible cures and treatments for the detrimental effects of using it;

- Funding and programs for accumulating and analyzing relevant medical and demographic information from minor users of social media, including the results of testing and diagnosis;

71

- Funding and programs for monitoring and policing schools for the presence of social media use and for behaviors associated with the mental health crisis fueled by Defendants; and

- Funding law enforcement and other services and costs associated with the harm done by Defendants to the public health and safety in Montgomery County.

F. Awarding forfeiture, disgorgement, restitutions, recission, and divesture of profits from use of Defendants' platforms in Montgomery County;

G. Providing injunctive and other equitable relief as necessary to protect the interests of Plaintiff and minors in his community and schools;

H. Awarding further injunctive relief as to Defendants' marketing, advertising, distribution and sale to ensure minors are not the intended recipient of Defendants' addictive platforms or marketing;

I. Awarding Plaintiff prejudgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after service of this Complaint;

J. Awarding the costs of this suit, including reasonable attorney fees; and

K. Providing such other and further relief as the Court deems just and proper.

## XI. <u>JURY TRIAL DEMANDED</u>

Plaintiff requests a jury trial, under Federal Rule of Civil Procedure 38, on all claims so triable.

DATED: November 2, 2023          Respectfully submitted,


_____
Kevin R. Steele, District Attorney
**MONTGOMERY COUNTY OFFICE
OF DISTRICT ATTORNEY**

*/s/ Joseph H. Meltzer*_____
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Joseph H. Meltzer (PA 80136)
Melissa L. Yeates (PA 202183)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
myeates@ktmc.com


*Counsel for Plaintiff the District Attorney of
Montgomery County, Kevin R. Steele*